USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 96-1378 DOUGLAS T. WIGHTMAN, ET AL., Plaintiffs, Appellants, v. SPRINGFIELD TERMINAL RAILWAY COMPANY AND UNITED TRANSPORTATION UNION, Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Harold A. Ross with whom Ross & Kraushaar Co., L.P.A., Shelley B. ______________ ____________________________ __________ Kroll, and Segal, Roitman & Coleman were on brief for appellants. _____ ________________________ John R. Nadolny for appellee Springfield Terminal Railway Co. and _______________ Norton N. Newborn with whom Norton N. Newborn Co., L.P.A., James F. __________________ ______________________________ ________ Freeley, Jr. and Freeley & Freeley were on brief for appellee United ____________ __________________ Transportation Union. ____________________ November 19, 1996 ____________________ STAHL, Circuit Judge. Appellants, Brotherhood of STAHL, Circuit Judge. _____________ Locomotive Engineers and several of its individual members ("BLE") sought to enjoin enactment of a clause in a newly negotiated collective bargaining agreement between Appellees United Transportation Union ("UTU") and Springfield Terminal Railway Co. ("ST"), as a violation of the Railway Labor Act ("RLA"), 45 U.S.C. 151-188. The district court denied the injunction and granted summary judgment for UTU and ST on BLE's complaint. Wightman v. Springfield Terminal Ry. Co., ________ _____________________________ 915 F. Supp. 503, 507 (D. Mass. 1996). BLE now appeals. Background Background __________ The RLA governs labor and collective bargaining arrangements between carriers, or employers, and unions. ST is a railroad operator located in Springfield, Massachusetts, and a carrier for purposes of the RLA. BLE and UTU are two of several trade unions who have collective bargaining agreements with ST. The individual plaintiffs in this case belong to BLE. The RLA authorizes carriers and unions to establish union shops. A union shop in the railroad industry simply means that in order to remain employed with a railroad company, employees must belong to one of the national, RLA recognized railroad unions. See 45 U.S.C. 152, ___ Eleventh(a) and (c).1 ST and the unions with which it  ____________________ 1. 45 U.S.C. 152 has been drafted in subsections First through Eleventh. Section 152, Eleventh contains subsections a through d. We note the unusual numbering scheme to explain -2- 2 maintains collective bargaining agreements have established a union shop.  Employment in the railroad industry revolves around crafts or classes of work, each of which is represented by a different union. Train service and engineer service constitute two such crafts. The former encompasses conductors, brakemen, trainmen and yardmen, and the latter includes primarily locomotive engineers. UTU represents the train service craft and BLE represents the engineer service craft.  By practice, junior engineers advance from the ranks of the train service employees. Over the course of any given year, however, the amount of engineer work may fluctuate. During periods of reduced engineer work, junior engineers may have to return temporarily to train service in order to remain employed.2 Junior engineers, therefore, have an economic interest in maintaining their train service seniority.  Prior to 1995, the UTU-ST collective bargaining agreement allowed non-UTU member engineers to continue to accrue train service seniority. In 1995, however, UTU negotiated a provision known as Article 21, which requires  ____________________ our citation.  2. In its reply brief, BLE appears to hint that the ebb and flow of train service employees to and from engineer service occurs with less regularity today than in prior eras.  -3- 3 that employees moving from train service to engineer service pay dues to UTU in order to maintain and continue to accrue their train service seniority. When BLE objected to Article 21, ST offered it a similar provision which BLE rejected, apparently believing it to be of little value to its membership.  BLE then challenged Article 21 on RLA grounds. It sought preliminary injunctive relief which the district court denied. Subsequently, on cross motions, the district court granted summary judgment in favor of UTU and ST. This appeal followed.  Standard of Review Standard of Review __________________ We review the award of summary judgment de novo. __ ____ Ortiz-Pinero v. Rivera-Arroyo, 84 F.3d 7, 11 (1st Cir. 1996). ____________ _____________ Summary judgment is appropriate in the absence of a genuine issue of material fact, when the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). ___ Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts deriving from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact. See ___ Fed. R. Civ. P. 56(c) and (e). Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary -4- 4 judgment per se. See Wiley v. American Greetings Corp., 762 ___ __ ___ _____ _________________________ F.2d 139, 141 (1st Cir. 1985). Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Id. As always, we resolve all factual disputes and any ___ competing, rational inferences in the light most favorable to the party against whom summary judgment has entered. Den ___ Norske Bank v. First Nat'l Bank of Boston, 75 F.3d 49, 53 ___________ ___________________________ (1st Cir. 1996).  Discussion Discussion __________ BLE raises three basic arguments, each of which involves a different statutory provision of the RLA. First, BLE contends, Article 21 violates the prohibition of mandated dual unionism under 45 U.S.C. 152, Eleventh(c). Second, BLE urges, Article 21 impermissibly interferes with employees' rights to organize and choose their own collective bargaining representative under 45 U.S.C. 152, Third and Fourth. Finally, BLE asserts, the RLA, 45 U.S.C. 156, required UTU and ST to provide BLE, an interested party, notice of their contract negotiations and an opportunity to participate in them. We conclude that the district court ably analyzed each of BLE's arguments and properly found them lacking in substance. We affirm. A. 45 U.S.C. 152, Eleventh(c) ________________________________ -5- 5 According to BLE, Article 21 violates 45 U.S.C.  152, Eleventh(c), part of the union shop provisions of the RLA. Analysis of BLE's argument requires a brief detour into the background of the union shop provisions generally, and how 152, Eleventh(c) fits into the union shop scheme.  Under 45 U.S.C. 152, Eleventh(a), carriers and unions may establish union shops. Section 152, Eleventh(a) specifically provides that carriers and unions may "make agreements, requiring as a condition of continued employment, that . . . all employees shall become members of the labor organization representing their craft or class." Read in isolation, the plain language of this provision would allow carriers and unions to require employees to belong not to the union of their choice, but to the union certified as the representative of their craft or class. Organized labor petitioned Congress for the union shop option in order to eradicate the problem of "free riders," railroad employees who do not pay dues to any union but receive whatever benefits collective bargaining confers. See generally Pennsylvania R.R. Co. v. Rychlik, 352 U.S. 480, ___ _________ _____________________ _______ 489-94 (1957). In acceding to labor's request, however, Congress recognized that the intercraft mobility not uncommon in the railroad industry could pose a problem for employees in a union shop. Under 152, Eleventh(a), an employee shuttling between train service and engineer service could -6- 6 either be forced to change unions or to belong and pay dues to two unions until reaching a level of seniority sufficient to stabilize him as an engineer. As the Supreme Court pointed out, "[t]he former alternative would, of course, be expensive and sometimes impossible, while the latter would be complicated and might mean the loss of seniority and union benefits." Id. at 490. Congress attempted to tailor ___ union shops to accommodate intercraft mobility through 152, Eleventh(c). That subsection provides, "[t]he requirement of membership in a labor organization in [a union shop] shall be satisfied . . . if said employee shall hold or acquire membership in any one of the labor organizations, national in scope, organized in accordance with this chapter." 45 U.S.C. 152, Eleventh(c). On its face, 152 Eleventh(c) appears to contradict 152, Eleventh(a) by allowing any employee in any union shop to belong to any of the RLA recognized railroad unions.  The purpose of 152, Eleventh(c), however, significantly circumscribes its language. See Rychlik, 352 ___ _______ U.S. at 488, 492; see also Landers v. Nat'l R.R. Passenger ___ ____ _______ ____________________ Corp., 814 F.2d 41, 44-45 (1st Cir. 1987) (recognizing _____ limited applicability of 152, Eleventh(c)), aff'd, 485 U.S. _____ 652 (1988). Despite its broad language, "the only purpose of Section 2, Eleventh(c) was a very narrow one: to prevent compulsory dual unionism or the necessity of changing from -7- 7 one union to another when an employee temporarily changes crafts." Landers v. Nat'l R.R. Passenger Corp., 485 U.S. _______ ___________________________ 652, 657-58 (1988); Rychlik, 352 U.S. at 492. Section 152, _______ Eleventh(c) does not exist to benefit unions by permitting them to recruit members from the ranks of other established unions, or to provide railroad employees with a general right to join unions other than the designated bargaining representative of their craft, except to meet the narrow problem of intercraft mobility in a union shop. Rychlik, 352 _______ U.S. at 493.  Bearing in mind the context and purpose of 152 Eleventh(c), we turn to BLE's challenge to Article 21. BLE essentially attacks Article 21 from two angles. First, BLE contends, Article 21 constitutes either a 152, Eleventh(a) union shop agreement that violates 152, Eleventh(c) or an amendment to the existing ST-UTU agreement that violates  152, Eleventh(c). Second, BLE argues, Article 21 will upset "the cost sharing scheme which was continued and fostered by the 1951 union shop amendments." We disagree.  On its face, Article 21 can neither constitute a union shop agreement by itself, nor an amendment to the ST- UTU agreement that violates Eleventh(c). Nothing in the language of Article 21 requires membership in UTU or any other union as a condition of employment. See Brotherhood of ___ ______________ Locomotive Eng'rs v. Kansas City S. Ry., 26 F.3d 787, 793 _________________ ___________________ -8- 8 (8th Cir.) ( 152, Eleventh(c) applies only to a 152, Eleventh(a) union shop agreement), cert. denied, 115 S. Ct. _____ ______ 320 (1994); Dempsey v. Atchison, Topeka and Santa Fe Ry. Co., _______ _____________________________________ 16 F.3d 832, 838 (7th Cir.) (same), cert. denied, 115 S. Ct. _____ ______ 82 (1994). Article 21 does not require an engineer to choose between dual union membership or unemployment; Article 21 simply requires an engineer to choose whether to retain and continue to accrue seniority in the train service craft. Wightman, 915 F. Supp. at 506.  ________ In Dempsey v. Atchison, Topeka and Santa Fe Ry. _______ ___________________________________ Co., 16 F.3d 832, 838 (7th Cir. 1994), the Seventh Circuit ___ faced a BLE challenge to a provision requiring engineers desirous of accumulating additional train service seniority to pay dues to UTU. Failure to pay, however, would not affect accrued seniority. In examining whether the provision constituted a union shop agreement, the Seventh Circuit relied in part on the fact that it did not require payment of dues to UTU in order to retain accrued seniority, implying that such a provision might constitute a union shop provision. Id. at 838 (citing NLRB v. Manitowoc Engineering ___ ____ _____________________ Co., 909 F.2d 963, 969-71 (7th Cir. 1990), cert. denied, ___ _____ ______ Clipper City Lodge No. 516 v. NLRB, 498 U.S. 1083 (1991)). ___________________________ ____ Ultimately, the court concluded that the provision at issue did not create any conditions of continued employment, and -9- 9 therefore, did not constitute a 152, Eleventh(a) union shop agreement. Id.  ___ In our view, the extra step Article 21 takes with respect to accrued seniority does not create any conditions on employment different from the provision in Dempsey. As _______ indicated, nothing on the face of Article 21 requires employees to belong to UTU in order to remain employed. Despite the fact that Article 21 takes the extra step of conditioning seniority retention and accrual on continued dues payment, an engineer who chooses BLE over UTU satisfies either of the UTU-ST or BLE-ST union shop requirements. To the extent, therefore, that Dempsey implies that a provision _______ such as Article 21 might constitute a union shop agreement or amendment, we respectfully disagree.  BLE, however, asserts that engineers who choose BLE over UTU run the risk of unemployment when shuttled back to train service, since they will have no train service seniority. According to BLE, this effectively forces those engineers at the lower end of the engineer seniority list either to belong to UTU and BLE, or to UTU instead of BLE, as a condition of continued employment at ST. BLE asserts that 152, Eleventh(c) allows a railroad employee in a union shop to change membership to any other RLA recognized union, "without putting himself out of compliance with the membership requirement of a valid union shop agreement and -10- 10 thereby cause a loss of seniority and employment rights." BLE's argument requires us to determine whether 152, Eleventh(c), in protecting against compulsory dual unionism, elevates seniority into a statutorily protected right employees may take with them as they move from craft to craft and union to union.  By its own language, the RLA governs relations between carriers, unions and employees, and 152, Eleventh(c) dictates the limits of what carriers and/or unions can demand of employees in a union shop. Within those parameters, which include a prohibition on compulsory dual unionism, the RLA makes no mention of seniority, and notably fails to designate seniority as a protected employment right. In the absence of a legislative pronouncement to the contrary, union contracts typically define the scope and significance of seniority rights. Aeronautical Indus. Dist. __________________________ Lodge v. Campbell, 337 U.S. 521, 526 (1949); Trailmobile Co. _____ ________ _______________ v. Whirls, 331 U.S. 40, 53 n.21 (1947). Seniority, ______ therefore, does not stem from the employer-employee relationship and by extension become an employment right, but rather from either a statute or the four corners of a collective bargaining agreement, in this case between a union and a carrier. National Labor Relations Bd. v. Whiting Milk ____________________________ ____________ Corp., 342 F.2d 8, 10-11 (1st Cir. 1965). It is by now well _____ -11- 11 established that in the absence of a contract creating seniority rights, they do not exist. See Dempsey, 16 F.3d at ___ _______ 839; United Food & Commercial Workers Union v. Gold Star ________________________________________ __________ Sausage Co., 897 F.2d 1022, 1026 (10th Cir. 1990); Cooper v. ____________ ______ General Motors Corp., 651 F.2d 249, 250 (5th Cir. 1981) _____________________ (citing cases); Local 1251 Int'l Union of United Auto., ___________________________________________ Aircraft and Agric. Workers of Am. UAW v. Robertshaw Controls ______________________________________ ___________________ Co., 405 F.2d 29, 32-33 (2d Cir. 1968) (citing cases) ___ (overruling prior circuit precedent to the contrary). Seniority, like any other benefit deriving exclusively from collective bargaining agreements, does not vest in employees. Robertshaw, 405 F.2d at 33; McMullans v. __________ _________ Kansas, Okla. & Gulf Ry., 229 F.2d 50, 53 (10th Cir. 1956). ________________________ Instead, seniority rights are subject to revision or even abrogation with the termination or renegotiation of the collective bargaining agreement.3 Dempsey, 16 F.3d at 839; _______ Robertshaw, 405 F.2d at 33; McMullans, 229 F.2d at 54. Any __________ _________ rights employees have in seniority, therefore, are tied directly to the terms of the labor agreement between the carrier and the union representing their craft. Nothing in  ____________________ 3. The Dempsey opinion ultimately views seniority as we do, _______ despite that court's implication that a provision such as Article 21 might constitute a union shop agreement. See 16 ___ F.3d at 838-39. Dempsey concludes that seniority, born of _______ the collective bargaining agreement, is subject to revision or abrogation. 16 F.3d at 839. We do not interpret Dempsey, _______ therefore, as supporting BLE's argument.  -12- 12 the RLA changes this fundamental tenet of labor law.4 Dempsey, 16 F.3d at 840; McMullans, 229 F.2d at 53.  _______ _________ We recognize that Article 21 may make it attractive for at least some engineers to choose UTU over BLE. We stop short, however, of equating a union's successful negotiation of a potential competitive advantage over another union with the kind of compulsory dual unionism 152, Eleventh(c) exists to prevent. See Whiting Milk, 342 F.2d at 11 ___ _____________ ("Obtaining a benefit for employees may well encourage others to join a union but that side effect does not violate the [NLRB], for 'The truth is that the union is a service agency that probably encourages membership whenever it does its job well.'") (quoting Local 357, Int'l Bhd. of Teamsters v. NLRB, __________________________________________ 365 U.S. 667, 675-76 (1961)). We conclude that 152, Eleventh(c) does not provide the statutory basis to vest railroad employees with their accrued seniority.  Finally, BLE asserts that Article 21 "upsets the sharing of costs of representation promoted by the 1951 amendments" in violation of 152, Eleventh(c).  ____________________ 4. BLE relies on three cases in support of its contention that Article 21 constitutes an illegal union shop agreement: Felter v. Southern Pac. Co., 359 U.S. 326 (1959), Birkholz v. ___________________________ ___________ Dirks, 391 F.2d 289 (7th Cir. 1968), vacated as moot, 395 _____ ________________ U.S. 210 (1969) and O'Connell v. Erie Lackawanna R.R., 391 ___________________________________ F.2d 156 (2d Cir. 1968), vacated as moot, 395 U.S. 210 _________________ (1969). BLE asserted these cases unsuccessfully to the Seventh Circuit in support of a nearly identical argument. See Dempsey, 16 F.3d at 838 n.6. We concur in that court's ___ _______ conclusion that these cases are inapposite.  -13- 13 Section 152, Eleventh(c) limits employees in a union shop to membership in those unions which qualify as electors of the union representatives on the National Railroad Adjustment Board ("NRAB"). The NRAB exists to settle disputes arising under collective bargaining agreements. See Rychlik, 352 U.S. at 487. As the Seventh ___ _______ Circuit pointed out, this requirement limits union shop participation to those unions which share the costs of administering the NRAB, and which "join together in other respects in the negotiating and policing of collective bargaining agreements under the dispute mechanisms of the RLA." Dempsey, 16 F.3d at 840. BLE appears to argue that _______ Article 21 has the effect of depriving it of dues that would offset its obligations to NRAB. See id. Nothing in the RLA, ___ ___ however, guarantees BLE a particular level of dues to offset its obligations to NRAB. Stated more broadly, the RLA does not protect any one union from competition with another over membership and dues.  B. 45 U.S.C. 152, Third and Fourth ______________________________________ Section 152, Third, entitled "Designation of representatives," provides that neither unions nor carriers "shall in any way interfere with, influence, or coerce the other in its choice of representatives." Section 152, Fourth, dealing with organization and the collective bargaining process, grants employees the right to organize -14- 14 and bargain collectively through representatives of their own choosing, and provides that no carrier may influence or coerce employees regarding their choice of labor organization, nor deduct dues or other fees of such organizations from employee wages. BLE contends that Article 21 violates the employee freedom of choice embodied in Third and Fourth, and also the prohibition on wage deductions in Fourth. Again, we disagree. In TWA, Inc. v. Independent Fed. of Flight __________ _____________________________ Attendants, 489 U.S. 426, 441 (1989), the Supreme Court noted __________ that 152, Third and Fourth operate primarily in pre- certification contexts, where unorganized employees seek to designate representatives and commence collective bargaining with employers. The Court reasoned that the RLA contemplates dispute resolution through private mechanisms, the success of which depends on the independence of the employees' "putative representative" and on neither party's access to the courts to further their own partisan ends. Id. (quoting Switchmen ___ _________ v. National Mediation Bd., 320 U.S. 297, 300 (1943)). In a ______________________ post-certification context, by contrast, the parties already have certified representatives and a collective bargaining record in place. In post-certification disputes, therefore, we must limit our intervention to cases in which the aggrieved union has no other remedy "to enforce the statutory commands which Congress had written into the [RLA]." Id.  ___ -15- 15 We have concluded that intervention in a post- certification dispute under 152, Third and Fourth will occur in extremely limited circumstances. See National R.R. ___ _____________ Passenger Corp. v. International Ass'n of Machinists and ________________ ________________________________________ Aerospace Workers, 915 F.2d 43, 51 (1st Cir. 1990). __________________ Specifically, we will intervene upon demonstration of carrier conduct reflecting anti-union animus, an attempt to interfere with employee choice of collective bargaining representative, discrimination, or coercion. Id. In addition, we will ___ intervene when a carrier commits acts of intimidation that cannot be remedied by administrative means, or commits a fundamental attack on the collective bargaining process or makes a direct attempt to destroy a union. Id.  ___ BLE purports to establish a genuine issue of material fact by listing 15 "facts" which it claims demonstrate anti-BLE animus sufficient to justify post- certification judicial intervention. We need not recite all of them here. We agree with the district court that BLE's facts, even if all true, at best demonstrate sharp bargaining practices between unions in an effort to gain competitive advantage. Wightman, 915 F. Supp. at 507. While BLE's facts ________ evince competitive jockeying between it and UTU, they notably fail to demonstrate anti-BLE animus or a fundamental attack -16- 16 on the bargaining process by ST.5 Accordingly, the District Court correctly declined to intervene in this post- certification matter. BLE also contends that Article 21 violates 152, Third and Fourth as a matter of law.6 BLE offers precedent under the National Labor Relations Act ("NLRA"), which it seeks to apply analogically to this railroad dispute. While the NLRA may provide analogies that bear on interpretation of the RLA, the Supreme Court has emphasized that "the NLRA 'cannot be imported wholesale into the railway labor arena.'" TWA, 489 U.S. at 439 (quoting Trainmen v. Jacksonville ___ ________ ____________ Terminal, 394 U.S. 369, 383 (1969)). We especially hesitate ________ to employ NLRA precedent in light of the clear and unequivocal RLA precedent from the Supreme Court, this circuit and others, which underscores the limited post- certification application of 152, Third and Fourth. See ___ TWA, 489 U.S. at 441 (limiting application of 152, Third ___ and Fourth to pre-certification contexts); Nat'l R.R. ___________  ____________________ 5. To be sure, it does not appear that ST was entirely candid with BLE regarding its negotiations with UTU and the substance of the ST-UTU agreement. The RLA, however, does not compel ST to inform BLE of the substance of negotiations with a third union, and we do not identify anti-BLE animus in ST's actions.  6. BLE essentially argues that by making it so attractive for engineers to join UTU, Article 21 has the effect of impermissibly interfering with their free choice of union, and coercing them to join UTU, in violation of 152, Third and Fourth. -17- 17 Passenger, 915 F.2d at 51 (same); see also Kansas City S., 26 _________ ___ ____ ______________ F.3d at 795; Dempsey, 16 F.3d at 841. Finally, BLE argues _______ somewhat opaquely that a wage deduction provision only passes RLA muster if it comprises part of a union shop agreement under 152, Eleventh. At the outset we note that Article 21 by itself does not refer to wage deductions, much less mandate them. Assuming such a wage deduction exists, however, we disagree with BLE's interpretation of 152, Fourth and Eleventh(b).  As indicated, 152, Fourth provides that carriers may not deduct union dues or fees from employee wages. Section 152, Eleventh(b), however, provides that carriers and labor organizations may make agreements providing for the deduction of "any periodic dues, initiation fees, and assessments" from employee wages as long as the employee has given the carrier written permission. 45 U.S.C. 152, Eleventh(b). Section 152, Eleventh(b), unlike Eleventh(c), does not limit its applicability to Eleventh(a), or union shop agreement situations. See Kansas City S., 26 F.3d. at ___ ______________ 794. Read together, 152, Fourth and Eleventh(b) provide that carriers may not unilaterally deduct dues from employee wages, but may do so upon the agreement of all parties involved. See id. Thus, even in the absence of a union shop ___ ___ agreement, employees and carriers may agree to a dues deduction schedule under 152, Eleventh(b).  -18- 18 C. 45 U.S.C. 156, Bargainable Interest _________________________________________ BLE contends that the District Court erred in not setting Article 21 aside on the basis that UTU and ST failed to notify BLE of their negotiations, and afford BLE the opportunity to participate in them.  The RLA mandates that "[c]arriers and representatives of the employees shall give at least thirty days' written notice of an intended change in agreements affecting rates of pay, rules, or working conditions" to interested parties. 45 U.S.C. 156. BLE identifies itself as an interested party, and contends that ST or UTU owed it notice. BLE also contends that it has joint jurisdiction over collective bargaining between ST and UTU, at least with respect to train service seniority, by dint of the routine shuttling of employees between the train service and engineer service crafts. According to BLE, that joint jurisdiction shouldhavegivenitanopportunitytoparticipateinthenegotiations. The Eighth Circuit recently faced BLE's argument and concluded that neither the carrier nor UTU had any statutory obligation to provide BLE with notice or the opportunity to participate in negotiations, a conclusion with which we substantially agree. See Kansas City S., 26 F.3d at ___ ______________ 792. 45 U.S.C. 156 exists to prevent either a carrier or union from unilaterally changing the terms of the operative collective bargaining agreement. Order of Railway Conductors ___________________________ -19- 19 and Brakemen v. Switchmen's Union of N. Am., 269 F.2d 726, _____________ ____________________________ 733 (5th Cir.), cert. denied, 361 U.S. 899 (1959). Section _____ ______ 156, therefore, furthers the overall purpose of the RLA to permit employees to choose their own bargaining representative freely, and to ensure a procedure for "the commencement of conferences between representatives of the two parties if changes are to be made in the contract." McMullans, 229 F.2d at 56. Section 156 does not exist to _________ open collective bargaining negotiations between a carrier and a union to any other union claiming an interest.  BLE relies chiefly on two cases, neither of which compel the conclusion BLE seeks. The first, Brotherhood of ______________ Locomotive Eng'rs v. National Mediation Board, 410 F.2d 1025, __________________ ________________________ 1030 (D.C. Cir.), cert. denied, 396 U.S. 878 (1969), involved _____ ______ a dispute between BLE and the firemen's union over apprentice engineers, a new class of railroad employees. The court determined that in the absence of a certified representative for the new class, any union that could fairly claim representation over the apprentices could legitimately bargain with the carrier about the terms and conditions of the apprentices' employment. Id. By demonstrating a fair ___ claim of representation, therefore, a union established a right to notice and the opportunity to participate under the RLA. Id. This case, by contrast, involves collective ___ bargaining between a represented class of employees and their -20- 20 carrier. BLE does not assert any claim of representation over UTU members, nor could it. Train service employees have already certified UTU as their bargaining representative. National Mediation Board, therefore, does not support BLE's ________________________ asserted interest in the negotiations that produced Article 21. BLE also relies on Illinois Cent. R.R. Co. v. _________________________ Brotherhood of Locomotive Eng'rs, 443 F.2d 136, 138, (7th __________________________________ Cir. 1971). The dispute in Illinois Central involved a _________________ tripartite agreement between the carrier, BLE and UTU governing the list of train service employees eligible for engineer work. UTU filed suit when BLE sought to negotiate revisions to the rules governing the list without providing UTU notice and an opportunity to participate. The court, noting the tripartite agreement, determined that UTU and BLE shared joint negotiating interests over the list, and therefore, that BLE could not unilaterally negotiate rule revisions with the carrier. Id. at 141. ___ Obviously no formal tripartite agreement exists in this case. BLE, however, points to language in Illinois ________ Central indicating that even in the absence of such an _______ agreement, the ebb and flow of employees between the two crafts would give the firemen an "important economic stake in the rules regulating the extra list" which in turn would establish a bargainable interest in UTU over rules governing -21- 21 the list. Id. at 141-42. BLE argues that the same ebb and ___ flow vests it with a bargainable interest in the negotiation of train service seniority.  We disagree with BLE's interpretation of Illinois ________ Central. First, that case revolved around a list outside of _______ either UTU's or BLE's collective bargaining agreements with the carrier. The rules governing the extra list, moreover, placed direct conditions on a fireman's employment -- they dictated which of the firemen could also engage in engineer work. BLE's assumption of sole negotiating responsibility over rules governing the list placed BLE in the position of representing firemen even though the firemen had certified UTU as their collective bargaining agent.  In this case, by contrast, UTU does not seek to unilaterally govern the ebb and flow itself. UTU, through Article 21, has simply negotiated with ST the mechanism through which train service employees accrue seniority, as part of negotiations over a general collective bargaining agreement. BLE and UTU have no tripartite agreement, nor is UTU attempting to unilaterally negotiate a set of rules governing movement between the two crafts.  As the Eighth Circuit concluded,  "[t]he distinctive division of railroad employees under the RLA into crafts or classes, and the regular movement of employees among the crafts that is characteristic of the industry, portends overlapping 'interests' among bargaining -22- 22 units in the composition of the crafts and in their labor agreements. That sort of interest, however, does not confer upon all unions the right to notice and participation in the arbitrations of all other unions." Kansas City S., 26 F.3d at 791-92. We conclude that the RLA ______________ does not provide BLE with a bargainable interest in Article 21 such that ST and UTU owed BLE notice and an opportunity to participate in the negotiations.  Affirmed. Affirmed ________ -23- 23